# 24-297

## United States Court of Appeals

### *for the*

## Second Circuit

CITY OF PHILADELPHIA, SAN DIEGO ASSOCIATION
OF GOVERNMENTS, MAYOR AND
CITY COUNCIL OF BALTIMORE,

*Plaintiffs-Appellees,*

– v. –

GOLDMAN SACHS GROUP, INC., JPMORGAN CHASE & CO., WELLS
FARGO & CO., BMO FINANCIAL GROUP, BMO FINANCIAL CORP., BMO
CAPITAL MARKETS CORP, BMO CAPITAL MARKETS GKST INC., FIFTH
THIRD BANCORP, FIFTH THIRD BANK, FIFTH THIRD SECURITIES, INC.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:19-CV-1608 (FURMAN, J.)

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

DANIEL L. BROCKETT
STEIG D. OLSON
DAVID M. COOPER
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010
(212) 849-7000

DAVID H. WOLLMUTH
WILLIAM A. MAHER
RONALD J. ARANOFF
RANDALL RAINER
WOLLMUTH MAHER
 & DEUTSCH LLP
500 Fifth Ave.
New York, NY 10110
(212) 382-3300

SETH ARD
TAMAR LUSZTIG
SUSMAN GODFREY LLP
1301 Avenue of the
Americas, 32nd Fl.
New York, NY 10019
(212) 316-8330

*Co-Lead Counsel for Plaintiffs-Appellees and the Class*

August 19, 2024

 (800) 4-APPEAL • (332277)

BANK OF AMERICA, N.A., BANK OF AMERICA CORPORATION,
BARCLAYS BANK PLC, CITIGROUP, INC., CITIGROUP GLOBAL
MARKETS LIMITED, ROYAL BANK OF CANADA, WELLS FARGO
FUNDS MANAGEMENT, LLC, MORGAN STANLEY, MORGAN STANLEY
SMITH BARNEY LLC, MORGAN STANLEY CAPITAL GROUP INC.,
JPMORGAN CHASE BANK N.A.,

*Defendants,*

BANC OF AMERICA SECURITIES LLC, MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED, BARCLAYS CAPITAL INC.,
CITIBANK, N.A., CITIGROUP GLOBAL MARKETS INC., GOLDMAN
SACHS & CO., J.P. MORGAN SECURITIES LLC, RBC CAPITAL MARKETS
LLC, WELLS FARGO BANK, N.A., WACHOVIA BANK, N.A., WELLS
FARGO SECURITIES LLC, MORGAN STANLEY & CO. LLC,

*Defendants-Appellants.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF THE ISSUE PRESENTED ....................................................2

STATEMENT OF THE CASE ............................................................................3

      A.     Defendants' Conspiracy To Inflate VRDO Rates ......................3

      B.     Common Evidence of Classwide Impact ..................................7

      C.     The District Court's Decision On Class Certification ..............10

SUMMARY OF ARGUMENT ..........................................................................15

ARGUMENT ....................................................................................................17

   I.     THE DISTRICT COURT ACTED WELL WITHIN ITS
        DISCRETION IN GRANTING CLASS CERTIFICATION ............17

      A.     The District Court Applied The Correct Legal Standard
          Of Rigorous Analysis In Concluding That Common
          Issues Predominate ..................................................................18

      B.     Defendants Err In Arguing That The Court Should Have
          Determined The Persuasiveness Of Plaintiffs' Expert
          Evidence ..................................................................................22

        1.     Defendants' Demand For The District Court To Resolve
          All Expert Disputes On Class Certification Defies
          Binding Precedent ..................................................................25

        2.     Defendants' Demand For The District Court To Resolve
          All Expert Disputes Is Logically Incoherent And
          Conflicts With Black-Letter Legal Principles ..........................36

      C.     The District Court Acted Well Within Its Discretion In
          Rejecting Defendants' Criticisms Of Plaintiffs' Expert
          Evidence As A Basis To Deny Class Certification ..................38

D.    The District Court Acted Well Within Its Discretion In
Finding That Defendants' Evidence Does Not Defeat
Predominance ..........................................................................48

CONCLUSION ...................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..................................................................18, 37, 55

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*,
    568 U.S. 455 (2013)....................................................................1, 25, 49

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................36

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ...................................................................34

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
    12 F.4th 81 (1st Cir. 2021)....................................................................52

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................30

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)............................................................................19, 29

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)............................................ 18, 21, 36, 48, 55

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)..................................................................18

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ..................................55

*Ellis v. Costco Corp.*,
    657 F.3d 970 (9th Cir. 2011)................................................................34

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)................................................................................30

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009) ..........................................................23

iii

*Goldman Sachs Grp. v. Ark. Teachers Ret. Sys.*,
    594 U.S. 113 (2021).................................................................30

*Green-Cooper v. Brinker Int'l, Inc.*,
    73 F.4th 883 (11th Cir. 2023)................................................35

*Haley v. Teachers Ins. & Annuity Ass'n of Am.*,
    54 F.4th 115 (2d Cir. 2022)...................................................38

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)..........................................................31, 51

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968)...............................................................54

*Hargrove v. Sleepy's LLC*,
    2023 WL 3943738 (3d Cir. June 12, 2023) .........................35

*Harrison v. Republic of Sudan*,
    838 F.3d 86 (2d Cir. 2016).....................................................38

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)...................................................35

*In re Initial Public Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).................................................32, 33

*Johannessohn v. Polaris Indus., Inc.*,
    9 F.4th 981 (8th Cir. 2021)....................................................52

*Kearns v. Cuomo*,
    981 F.3d 200 (2d Cir. 2020)...................................................24

*Kurtz v. Costco Wholesale Corp.*,
    818 F. App'x 57 (2d Cir. 2020)..............................................32

*In re Lamictal Direct Purchasers Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020)...................................................35

*Lytle v. Nutramax Lab'ys, Inc.*,
    99 F.4th 557 (9th Cir. 2024)..................................................33

iv

*Mazzei v. Money Store,*
829 F.3d 260 (2d Cir. 2016) ............................................................... 36

*Myers v. Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010) ............................................................... 18

*In re Namenda Indirect Purchaser Antitrust Litig.,*
338 F.R.D. 527 (S.D.N.Y. 2021) ....................................................... 44

*Nat'l ATM Council v. Visa Inc.,*
2023 WL 4743013 (D.C. Cir. July 25, 2023) .................................. 34

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
31 F.4th 651 (9th Cir. 2022) ........................................... 23, 33, 34, 46

*In re Petrobras Sec.,*
862 F.3d 250 (2d Cir. 2017) ......................................................... 38, 49

*In re Rail Freight Antitrust Litig.,*
725 F.3d 244 (D.C. Cir. 2013) .......................................................... 34

*In re Rail Freight Antitrust Litig.,*
934 F.3d 619 (D.C. Cir. 2019) .......................................................... 34

*In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.,*
335 F.R.D. 1 (E.D.N.Y. 2020) .......................................................... 23

*Roach v. T.L. Cannon Corp.,*
778 F.3d 401 (2d Cir. 2015) .............................................................. 29

*Sykes v. Mel S. Harris & Assocs.,*
780 F.3d 70 (2d Cir. 2015) ................................................................ 48

*Teamsters Local 445 v. Bombardier, Inc.,*
546 F.3d 196 (2d Cir. 2008) ......................................................... 32, 33

*Tyson Foods, Inc. v. Bouaphakeo,*
577 U.S. 442 (2016) ..................... 1, 3, 7, 8, 25, 26, 27, 28, 32, 34, 35, 36, 37, 39

*In re U.S. Foodservice Inc. Pricing Litig.,*
729 F.3d 108 (2d Cir. 2013) ................................................... 29, 32, 33

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010)............................................................33

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014)......................................................46

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023)....................................................51, 52

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)........................................................18, 22, 25

*West v. Prudential Securities, Inc.*,
  282 F.3d 935 (7th Cir. 2002)..........................................................33

## **Statutes**

28 U.S.C. § 2072..............................................................................37

## **Rules**

Fed. R. Civ. P. 23..............................................19, 20, 25, 34, 36, 37, 38

Fed. R. Civ. P. 56..............................................................................36

vi

## PRELIMINARY STATEMENT

The district court acted well within its discretion in certifying Plaintiffs' class of VRDO issuers. Defendants' brief characterizes the district court's analysis as insufficiently rigorous, but Defendants ignore much of the district court's analysis, which explained both why Plaintiffs' expert evidence satisfied *Daubert* and why common issues predominate. Indeed, this is the rare case where Defendants conceded that *something* had a disproportionate impact on the price of the product (here, VRDO rates). Defendants do not and cannot contest the district court's finding that the jury can decide the key question of what caused this impact—the financial crisis (as Defendants contend) or Defendants' daily collusion (as Plaintiffs contend)—on a classwide basis.

Defendants' brief rests on the theory, not raised below, that a rigorous analysis requires the district court to resolve *all* disputes between the experts. But the Supreme Court, this Court, and other circuits have all rejected Defendants' theory. It is well established that, in ruling on a motion for class certification, the district court should examine only whether a question can be decided classwide using common evidence, not whether it will be answered in the plaintiffs' favor, *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 459 (2013), and that the persuasiveness of expert evidence is a matter for the jury, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).

1

Defendants' argument also ignores the fundamental principle that the district court's view of persuasiveness would not bind the jury. The judge's opinion about which side would win in a battle of the experts has no bearing on the evidence before the jury and is therefore irrelevant to whether issues can be decided on a classwide basis. Indeed, Defendants' criticisms of Plaintiffs' experts, based almost entirely on common evidence, confirm this is a classwide, fact-intensive dispute that the jury should decide.

Defendants mention individualized evidence only at the end of their brief, but they fail to confront the district court's finding that common issues would predominate even after taking account of the limited individualized evidence presented below. Under this Court's precedent, the district court is entitled to substantial deference in its finding of predominance after weighing common and individualized evidence. Defendants present no basis to overcome that deference here.

## STATEMENT OF THE ISSUE PRESENTED

Whether the district court acted within its discretion in certifying a class where the court carefully analyzed all of Defendants' criticisms of Plaintiffs' expert models, found those models reliable under *Daubert* and capable of proving Plaintiffs' claims on a classwide basis, and determined that any individualized evidence would not defeat the predominance of common issues.

2

## STATEMENT OF THE CASE

### A.  Defendants' Conspiracy To Inflate VRDO Rates

VRDOs are bonds issued primarily by municipalities and charitable entities, such as schools and hospitals, to raise money for their operating expenses and public projects.  SPA2.[1]  VRDOs are long-term bonds whose rates are reset on a periodic basis—typically weekly—by banks acting as remarketing agents ("RMAs").  *Id.*  To attract investors, VRDOs also include a "put" feature that allows investors to redeem the bonds at any periodic reset date at face value—"par"—plus any accrued interest.  *Id.*  At each reset period, RMAs are contractually obligated to set the lowest possible rate that will allow a VRDO to trade at par.  *Id.*  RMAs are also required to remarket VRDOs to investors at the lowest possible rate after an investor exercises the "put" option on the bond.  *Id.*

Defendants are some of the largest financial institutions in the world and also major players in the VRDO market.  They collectively serve as RMAs for more than 70% of VRDOs.  JA261.  In a competitive market, Defendant-RMAs compete against each other for issuers' business by setting the lowest possible rates for their

---

[1]  "SPA" refers to the district court opinion appended to Defendants-Appellants' Brief as the Special Appendix.  "JA" refers to the Joint Appendix.  "Br." refers to Defendants-Appellants' brief.  "Dkt." refers to the district court docket (No. 19-CV-1608 (S.D.N.Y.)).

clients; if any RMA sets higher rates than the market entails, issuers can replace that RMA with another.  SPA3.

But, as the common evidence shows, Defendants did not compete against one another on VRDO rates.  Instead, they conspired to set rates above competitive levels from no later than 2008 through 2015.  Defendants did so because inflating VRDO rates increased the chances of placing the bond with an investor and lowered the chances that they would have to take VRDOs into their "inventory"—a costly result that risked wiping out a "significant portion of an entire year's remarketing fees." JA2263.

Defendants carried out this conspiracy through a virtually unprecedented level of coordination on their internal, prospective VRDO "base rates."  Base rates represented initial rates that Defendants used as a "starting point" or reference point to price the individual VRDOs in their portfolio, which they often priced in the form of a spread to the base rate.  JA445-46, 452-53, 465-66, 474-75, 482-84, 496-97, 499, 587-88.  Thus, coordination on base rates provided a readily available means for coordination across all Defendants' VRDOs.  JA297-99.

Defendants regularly exchanged with each other prospective VRDO rate and inventory information for that day through an S&P index and through direct communications such as chats, phone calls, and other means.  For a large portion of the conspiracy period, Defendants exploited pricing indices compiled by J.J. Kenny,

which was owned by S&P, to communicate about the VRDO rates they planned to set. JA128-29, 243-50, 467, 495, 541, 543, 589-90, 604, 612, 626, 638-39, 648-49. The most important of these indices was the Weekly High-Grade Index, which J.J. Kenny released every Monday, Tuesday, and Wednesday morning, and, when the market was volatile, also on Thursdays and Fridays. JA638-39.

S&P marketed the Weekly High-Grade Index "as comprised of thirty-four M IG-1 rated issues," which are "averaged to derive the index." JA2099 n.224. But this public explanation is directly at odds with evidence in this case demonstrating that the index was a vehicle for Defendants to share their prospective rates. To compile the Weekly High-Grade Index, J.J. Kenny's employee called RMAs in the morning and asked them, "Where do you want to be on High Grade?" JA648. Defendants responded with the base rate they expected to set that day and their spreads for key VRDO categories, like New York and California-based VRDOs. JA467, 495, 541, 589-90, 604, 612, 626, 649. The J.J. Kenny employee would then call back the RMAs and provide the average of each submission, plus the anonymized price quotes he received that morning from other banks—all before Defendants' afternoon deadline for finalizing rates. JA128, 245-47, 640, 642-45. The J.J. Kenny employee effectively circulated to each RMA the base rates that its competitors were quoting on their VRDOs. JA246. All of the Defendants participated in the Weekly High-Grade Index and knew who was contributing to the

5

index.  JA235, 247, 640, 642.  Academic literature explains that this type of exchange of forward-looking information on pricing intentions facilitates collusion. JA283-97, 2096-101.  Unsurprisingly, Defendants relied on the Weekly High-Grade Index when setting their own rates.  JA129, 248, 545, 548, 550.

After the LIBOR rate-manipulation scandal came to light in 2012, Defendants began to distance themselves from J.J. Kenny's indices.  JA129, 255-56, 487, 558, 619-20.  The estimated average VRDO overcharges by Dr. William Schwert, one of Plaintiffs' experts, began to decrease at the same time.  JA148-53.  But even after 2012, Defendants still continued to share prospective rate information through another intermediary.  Throughout the Class Period, this intermediary contacted Defendants' rate setters to obtain "weekly reset talk" for VRDOs and then reported the information he gleaned from these conversations in public market commentary daily.  JA130, 257-58, 660-61.

Defendants also directly communicated with each other on their future rates, using thinly veiled code, such as "what do u think for SIFMA?" (referring to a market index of VRDOs), JA503; *see also* JA505, 507, or exchanging information about their confidential VRDO inventory levels, JA524, 526, 528, 530.  Defendants' discussions often included specific predictions about rates.  JA503, 505, 507.  For example, in a February 2010 Bloomberg message, Morgan Stanley's rate setter told Goldman Sachs's rate setter "I think we're 0.19% +/- 1bps. You?" JA507.  Goldman

6

Sachs's rate setter agreed, noting "DAILIES FLYING OUT THE LOW TEENS SO THAT'S ABOUT RIGHT." *Id.* Defendants also shared with each other commercially sensitive and proprietary information on their respective VRDO inventory levels, noting when their inventories were "heavy" or "swollen." JA254-55, 521-22, 524, 526, 528, 530, 617, 628-31. This meant that their respective inventory levels were high, and that Defendants therefore would raise their rates to get rid of inventory. JA253-54, 267-77, 512-13, 584-85, 605-06, 616, 618.

Defendants knew that these types of communications were barred by their own antitrust policies, but they still shared their proprietary pricing and inventory information with each other on a near-daily basis, facilitating their ability to collusively inflate rates. JA285-86, 628-31.

### B. Common Evidence of Classwide Impact

Defendants do not contest that Plaintiffs can rely on common evidence to prove collusion. SPA20. On the issues of injury and damages, Plaintiffs put forth reports by two well-respected economists, each of whom demonstrated classwide impact from the conspiracy through complementary approaches. JA107-220, JA222-422.

*First*, Plaintiffs offered the analyses of Dr. William Schwert, a leading expert in financial economics and a Distinguished Professor of Finance and Statistics Emeritus at the University of Rochester. JA111. Even Defendants' expert,

Dr. Glenn Hubbard, agreed that Dr. Schwert is a well-respected economist. JA2215. Dr. Schwert constructed two multi-variate regression models to estimate the effects of the conspiracy on VRDO rates. JA134-140, 146-59; SPA7. For his first regression analysis, Dr. Schwert used a multiple dummy variable model, under which each dummy variable represents a separate time period during the conspiracy and measures the average effect of the conspiracy on VRDO rates during that period. JA146-47; SPA8. This model uses data from both the conspiracy and non-conspiracy periods to estimate the coefficients of the explanatory variables Dr. Schwert used to control for the factors, other than the conspiracy, that affect VRDO rates. JA134; SPA8. Dr. Schwert's second regression analysis was a "backcasting" or "prediction" model, which uses data from the post-conspiracy "clean" period to estimate the coefficients for the explanatory variables. JA134-35; SPA8. This model predicts what VRDO rates would have been during the conspiracy period, but for the existence of Defendants' conspiracy. *Id.* The differences between actual VRDO rates and Dr. Schwert's predicted VRDO rates measures the effect of the conspiracy on VRDO rates. *Id.*

Dr. Schwert used nine different explanatory variables to capture the macroeconomic and VRDO-specific factors that affect VRDO rates. JA138-40; SPA9. These include two variables to "control for the general level of default risk in the economy." JA138. To measure "the risk that the liquidity provider will not

be able to pay its obligations if the issuer does not," Dr. Schwert used a "commercial paper premium" variable, which measures the average riskiness of issuers of financial commercial paper. JA138. To measure "the risk that the VRDO's issuer will not be able to pay its obligations," Dr. Schwert used a "municipal bond premium," which measures the average riskiness of fixed-rate securities issued by municipalities. JA138-39.

Dr. Schwert also included seven VRDO-specific variables to account for characteristics that affect a VRDO's individual rate, like tax status, issuer's state, and short-term and long-term ratings. JA139-40. A VRDO's short-term rating reflects its risk associated with its liquidity provider, while its long-term rating reflects its risk associated with its issuer. JA1898. With all these variables, Dr. Schwert controlled for the effects of macroeconomic conditions, like the financial crisis, on VRDO rates. JA1899-08. In response to Defendants' critiques, Dr. Schwert also demonstrated that his results are not sensitive to the inclusion of periods of financial distress. JA1904-14.

As the district court noted, the "results of Dr. Schwert's analyses are stark." SPA9. Dr. Schwert found that 99.3% to 99.5% of VRDOs in the class were injured by the conspiracy. JA155, 158. Defendants sought to critique Dr. Schwert's regressions by offering the rebuttal testimony of Dr. Glenn Hubbard. But Dr. Hubbard's models generated nonsensical results, such as large negative damages

during parts of the conspiracy period, JA1947-48, and even those models found that virtually all class members suffered some injury, JA1945-48.

*Second*, Plaintiffs offered the complementary analyses of Dr. Rosa Abrantes-Metz, a former economist at the Federal Trade Commission and Adjunct Professor at New York University. JA225. Dr. Abrantes-Metz conducted a market-structure analysis, concluding that a conspiracy to increase VRDO rates was likely to have been effective and that Defendants had readily available means to coordinate their base rates. JA297-98. Dr. Abrantes-Metz also conducted a "base rate study" with qualitative and quantitative components. JA298-99; SPA17. In the qualitative component, Dr. Abrantes-Metz found, after examining the record, that Defendants calculated their VRDO reset rates "by reference to a base rate." JA300-10; SPA17. In the quantitative component, Dr. Abrantes-Metz found a nearly one-to-one relationship between Defendants' base rates and their final VRDO rates and that Defendants' base rates often moved together. JA310-31; SPA18. Dr. Abrantes-Metz concluded that coordination on base rates (as Plaintiffs alleged here) had a common impact on all or virtually all class members. JA331; SPA18.

## C. The District Court's Decision On Class Certification

On September 21, 2023, following a lengthy hearing, the district court denied Defendants' *Daubert* motion to exclude the opinions of Dr. Schwert and Dr. Abrantes-Metz, and certified the class. SPA1-31.

The court explained the foundation for Plaintiffs' expert models and how they support finding injury to all or virtually all class members, analyzed Defendants' objections to those models, and concluded that the models were reliable and should not be excluded. SPA7-19. Before analyzing Dr. Schwert's models and Defendants' challenges to them, the district court noted that "regression models are routinely used – and accepted – in antitrust cases" and that "no complex model is perfect." SPA10. The court then went on to carefully consider each of Defendants' challenges to Dr. Schwert's models.

*First*, contrary to Defendants' argument that Dr. Schwert did not account for the financial crisis and the European Sovereign Debt Crisis, the court noted that Dr. Schwert *did* account for these macroeconomic conditions "by using the commercial paper premium and municipal bond premium variables." SPA11; JA1899-902. Defendants' argument, the district court concluded, "boils down to an argument over which reasonable economists can (and apparently do) differ." SPA11. The district court concluded that these "squabbles are more appropriately resolved later in the litigation." SPA11.

*Second*, the district court rejected Defendants' argument that purported instability in the relationship between VRDOs, commercial paper, and long-term municipal bond rates undermines Dr. Schwert's models. SPA12. The court credited

Dr. Schwert's explanation that the value of his regressions come from their predictions, not the specific coefficients of any explanatory variable. SPA12.

*Third*, Defendants took issue with Dr. Schwert's selection of his commercial paper and municipal bond premium variables, but the district court again found that Dr. Schwert's explanations for his selection of variables were sufficient. SPA12-13. The court credited Dr. Schwert's explanation that a long-term municipal bond premium captures the general macroeconomic default risk attributable to VRDO issuers not paying their obligations. SPA13; JA138-39. The court also noted that "Defendants' model that replaces [his] municipal bond premium variable with a short-term version" has its own problems, such as "produc[ing] damages that make no economic sense"—namely, enormous negative damages in 2008. SPA13 (alterations in original) (quoting JA1963). Defendants specifically argued that the financial crisis affected VRDOs in a way that it did not affect commercial paper because the Federal Reserve intervened in the commercial paper market. SPA13. But the court rejected this argument because the Federal Reserve's intervention did not reduce commercial paper premiums—the actual variable Dr. Schwert used—below pre-financial crisis levels. SPA13; JA1964-65. In sum, the court found that "Dr. Schwert controlled for various external factors that could influence VRDO rates, and he grounded his models in well-supported, reasoned methodology." SPA13.

12

*Fourth*, the district court agreed with Defendants that "[f]alse positives can indeed be fatal to a model," but the court rejected Defendants' false-positives challenge to Dr. Schwert's models because Defendants failed to point to evidence of "systemic false positives produced by Dr. Schwert's models." SPA14. The district court also rejected Defendants' arguments based on purported false positives in "modified versions of Dr. Schwert's models put forward by Defendants' rebuttal expert, Dr. Glenn Hubbard," as opposed to in Dr. Schwert's models themselves. SPA15. The district court further found that any supposed false positives in Dr. Schwert's models in March 2020 alone do "not doom Dr. Schwert's models," because March 2020 represents less than 1% of the total period Dr. Schwert studied. SPA15-16. As to Defendants' argument that Dr. Schwert's models produced so-called "nonsensical" results in finding high inflation at the same time as high VRDO inventory, the district court credited Plaintiffs' "reasonable explanations of why these potentially cherry-picked examples were misleading snapshots in time that might not genuinely represent false positives." SPA15.

*Finally*, the district court rejected Defendants' argument that Dr. Schwert's models hide supposedly uninjured class members. This was because Defendants' arguments that there was more than a de minimis number of uninjured class members improperly relied on "Dr. Hubbard's *modified* versions of Dr. Schwert's models," not on Dr. Schwert's models themselves. SPA16.

The district court also "swiftly rejected" Defendants' challenges to Dr. Abrantes-Metz's analyses, concluding that "her models are theoretically capable of evidencing a common impact, and her factual analysis actually does so," SPA18-19 (cleaned up). It found that market structure analyses like Dr. Abrantes-Metz's here have been accepted by other courts as common evidence of antitrust impact. SPA17. The district court rejected Defendants' challenge that Dr. Abrantes-Metz's quantitative rate study did not control for macroeconomic factors, noting that she did so in her reply report and concluded that it did not change her analyses. SPA18. In response to Defendants' critique that Defendants' rate-setters did not uniformly set VRDO reset rates with reference to a base rate, the district court noted that Dr. Abrantes-Metz's finding to the contrary was backed by "ample evidence in the record." *Id.*

The district court then went on to address and reject all further arguments Defendants made against class certification. SPA19-30. The district court explained that, under *Tyson*, the persuasiveness of the expert evidence was a matter for the jury. SPA21. In addition, the court concluded that Defendants' assertion of the need for individualized inquiries was unsupported and, even if their evidence were correct, it would not defeat the predominance of common issues. SPA22-23. The district court explained that, unlike the plaintiffs' experts' models in the cases Defendants cited, Dr. Schwert's models find that over 99% of VRDOs were injured

14

by the conspiracy. SPA24. The court further noted that "Defendants offer no counter-estimate of how many individualized inquiries would be required" and concluded that regardless of some individualized inquires, common issues predominate. SPA24, 30.

## SUMMARY OF ARGUMENT

The district court properly employed rigorous analysis in finding that common issues predominate and certifying the class. Defendants' suggestion to the contrary mischaracterizes the district court decision and ignores the court's detailed discussion of all of the evidence and the dispute among the experts. Defendants fault the court for relying on *Daubert*, but the court did not stop there. Rather, it also examined whether—given the admissibility of Plaintiffs' expert evidence—common issues would predominate at trial and found that they would.

Defendants' attempt to impose a requirement that the court resolve every dispute between the experts at class certification lacks any legal basis. The Supreme Court in *Amgen* held that courts must examine whether questions common to the class predominate, not how those questions will be answered. And the Court in *Tyson* specifically applied that principle to a dispute over expert testimony. These holdings are dispositive here. This Court and other circuits have likewise rejected the idea that courts should resolve all expert disputes on class certification.

Defendants' approach not only defies overwhelming precedent, but conflicts with fundamental principles of law. A district judge cannot usurp the jury's role in deciding which side's evidence is ultimately correct. This Court has accordingly held that the judge's view of the evidence on class certification cannot bind the jury. Thus, the judicial "resolution" of expert disputes that Defendants seek is a contradiction in terms. Regardless of which side's experts the judge finds more persuasive, the jury can find otherwise, and the judge's belief about persuasiveness has no bearing on the trial or the predominance of common issues at trial. Defendants' approach also ignores the Rules Enabling Act's prohibition on imposing a greater hurdle for classwide claims than for individual claims.

Defendants' criticisms of Plaintiffs' expert opinions only confirm the classwide nature of the inquiry, as they concern issues common to the class that the jury would decide for the class as a whole. Regardless, the district court addressed each criticism and explained precisely why none undermined the predominance of common issues. In particular, Defendants claim that Plaintiffs' expert model produces false positives or nonsensical outcomes. But Defendants rely largely on their own reworked model, which produces its own absurd result of large negative damages. Defendants also ignore the reasons why the outcomes of Plaintiffs' expert model are perfectly consistent with the evidence and economic theory, as the district court recognized. Defendants complain about the particular variables included or

excluded from Dr. Schwert's model, while again ignoring his explanations for his choice of variables. Defendants further dispute the findings of Plaintiffs' other expert, Dr. Abrantes-Metz, by mischaracterizing her analysis, which shows that if Defendants conspired to inflate base rates, then the conspiracy would inflate all or virtually all VRDO rates.

Finally, Defendants err in arguing that their individualized evidence defeats predominance. The district court recognized the existence of some individualized evidence and concluded that common issues nonetheless predominate. This Court has repeatedly recognized that the decision on this issue is a discretionary judgment that properly belongs to the district court. Moreover, the district court's judgment here was well supported by the record. Defendants claim that evidence regarding thousands of VRDOs would be presented at trial, but they never presented such evidence to the district court or suggested that such evidence would be necessary. The limited individualized evidence that they did present would not come close to predominating over the common issues, as the district court correctly found.

## ARGUMENT

## I. THE DISTRICT COURT ACTED WELL WITHIN ITS DISCRETION IN GRANTING CLASS CERTIFICATION

This Court reviews an order on class certification for abuse of discretion and it exercises "even greater deference when the district court has certified a class than

when it has declined to do so." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (citation omitted). "[T]he district court's application of [the legal] standards to the facts of the case is … reviewed only for abuse of discretion," which "means that the district court is empowered to make a decision—of *its* choosing— that falls within a range of permissible decisions." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quotation marks omitted). "Implicit in this deferential standard when applied in the class action context is a recognition of the district court's inherent power to manage and control pending litigation." *Id.* (cleaned up). Defendants mention (Br. 20) the abuse-of-discretion standard once in their Standard of Review section, but fail to apply it in their brief.

Defendants also ignore the principle that predominance is "a test readily met in certain cases alleging … violations of the antitrust laws." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). The district court's certification decision here, after careful review of all of the evidence, was well within its discretion.

A.   **The District Court Applied The Correct Legal Standard Of Rigorous Analysis In Concluding That Common Issues Predominate**

The parties agree that the district court must conduct a "rigorous analysis" of whether common issues predominate. *See Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 250 (2011) ("[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." (cleaned up)). That is exactly the test that the district court applied: "In evaluating whether the moving party has met its burden, the Court must engage in a 'rigorous analysis,' in which it is permitted to 'probe behind the pleadings before coming to rest on the certification question.'" SPA5 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). The parties also do not dispute and the district court likewise correctly held that the "party seeking certification must demonstrate by a preponderance of the evidence that all the requirements of Rule 23 have been met." SPA4.

The court engaged in the required rigorous analysis through meticulous review of all of Defendants' complaints about Plaintiffs' expert opinions, explaining why each does not defeat predominance. SPA5-30. Defendants repeatedly assert (Br. 24-31) that the district court did not "analyze" the evidence or that the analysis was not "rigorous" enough. But there is no question that the court examined the evidence and the parties' respective arguments about the evidence in an extremely thorough way. SPA5-30. Indeed, Defendants fail to identify any substantive issue that the district court did not analyze. In any event, there is no plausible basis for this Court to micromanage the district court's analysis based on a general criticism of the level of rigor in that analysis. The standard is abuse of discretion. The district

court's express adoption of the "rigorous analysis" standard and application of that standard to the facts is not remotely an abuse of discretion.

The real question is not what the district court analyzed, but what finding the court supposedly should have made after analyzing the evidence and arguments. Defendants assert (Br. 30) that the district court "substituted a mere admissibility analysis of Plaintiffs' expert evidence for a rigorous Rule 23 analysis." But the district court actually said the opposite—that *Daubert* "does *not* end the analysis." SPA21 (emphasis added). Defendants' discussion of *Daubert* and rigorous analysis rests on a false dichotomy. *Daubert* is a significant *part* of rigorous analysis because the admissibility of expert testimony determines the evidence the jury will see and thus impacts whether the jury can resolve the issues on a classwide basis. But the existence of admissible expert testimony does not itself decide whether common issues predominate, which is why the district court properly addressed that question after determining what evidence was admissible. Defendants are accordingly wrong in stating (Br. 31) that "deferring to admissible expert evidence offered by the plaintiffs would overturn" precedent, as there was no "deference" and no holding that admissibility necessarily means predominance of common issues.

Indeed, Defendants largely ignore the part of the district court's rigorous analysis unrelated to *Daubert* that shows precisely why common issues predominate here. As the court explained, during the alleged conspiracy period, VRDOs behaved

20

differently from other comparable financial instruments. SPA20. Defendants claim (Br. 46 n.9) they never made a concession on this point. But Plaintiffs' counsel, JA2487, and the district court, SPA20, cited Defendants' *Daubert* brief, in which they argued that "[t]he Financial Crisis had a profound and disproportionate impact on VRDO rates." Dkt. 399 at 7. Defendants thereby recognized that *something* impacted VRDO rates disproportionately—according to Defendants, it was the financial crisis, and according to Plaintiffs, it was the conspiracy.

Thus, "the primary dispute" is whether the change in VRDO rates is attributable to the conspiracy or some other economic factor. SPA20. The jury can resolve that dispute on a classwide basis, and the resolution will apply to all class members. This Court has held that, even where there might be individual issues regarding injury, a district court has discretion to find the predominance requirement satisfied where, as here, there is at least a common question as to "whether, assuming a plaintiff paid supracompetitive prices, that payment was caused by the defendants' antitrust violation." *Cordes*, 502 F.3d at 108. That Defendants (incorrectly) believe the answer to this question is "no" does not change the predominance analysis.

Moreover, while the district court did not need to decide whose explanation for why VRDO rates were impacted disproportionately during the Class Period is correct, Plaintiffs' explanation is undoubtedly more plausible. The parties agree VRDO rates were elevated precisely during the period when Defendants were

sharing their proprietary VRDO base rates on a near-daily basis. *See supra* at 4-7. Plaintiffs claim that Defendants' conspiracy caused VRDO rates to go up, consistent with economic theory that coordination of the type Defendants engaged in is likely to raise prices. JA283-97, 2096-101. The inflation of VRDO rates decreased when Defendants stopped engaging in near-daily collusion through the J.J. Kenny index in the wake of the LIBOR scandal, then dissipated altogether. JA129, 148-53, 256. Defendants, meanwhile, offer (Br. 10-11) an unintuitive explanation that the entire Class Period consisted of "extreme economic conditions" that "created a 'perfect storm'" disproportionately affecting VRDOs. Plaintiffs are thus capable of "produc[ing] a common answer to the crucial question" of what caused the disproportionate impact on VRDO rates in their favor. *Wal-Mart*, 564 U.S. at 352.

## B. Defendants Err In Arguing That The Court Should Have Determined The Persuasiveness Of Plaintiffs' Expert Evidence

Defendants scrupulously avoid saying precisely what they believe is required for a sufficiently "rigorous" analysis. The closest they come is the assertion (Br. 21) that the district court should have "determined by a preponderance of the evidence whether Plaintiffs' expert evidence can or cannot distinguish between injured and uninjured class members" (quotation marks omitted). Indeed, Defendants repeatedly use (Br. 25, 28, 35) the "can or cannot distinguish" phrase to describe the finding that the district court supposedly should have made. But the court correctly

explained that "[d]istrict courts in this and other Circuits have held that a class may be certified so long as a *de minimis* number of class members were uninjured or, conversely, virtually all class members were injured," SPA16 (quoting *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 17 (E.D.N.Y. 2020)), and found that the common evidence *can* prove antitrust injury on a classwide basis for all or virtually all class members. SPA5-25.

Defendants do not even attempt to argue that a jury could not find Plaintiffs' expert analysis to be correct or, more generally, that a jury could not find Defendants caused antitrust injury to all or virtually all class members. Defendants argue (Br. 25, 40-48) only that the jury could credit an alternative explanation for the conclusions reached by Dr. Schwert. Thus, there is no real dispute that the common evidence *can* demonstrate antitrust injury on a classwide basis. And once the district court determines that the plaintiffs' model is "*capable* of showing that … class members suffered antitrust impact on a class-wide basis, *notwithstanding* [the defendants' expert's] critique," questions about which expert is right are questions "of persuasiveness for the jury." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 681 (9th Cir. 2022) (en banc); *see also* SPA10 ("Put differently, 'the real question' is whether Plaintiffs 'have established a *workable multiple regression equation*, not whether their model actually works'" (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100

(D. Conn. 2009) (cleaned up))). As discussed below, to the extent Defendants argue that the district court should have determined whether Plaintiffs *will* do so successfully, that argument is meritless. *See infra* 25-38.

While Defendants do not identify exactly what degree of persuasiveness Plaintiffs' common evidence must satisfy, they argue generally that the district court must reject class certification if the evidence is deemed unpersuasive. In particular, Defendants argue (Br. 3) that the court should "resolve Defendants' challenges to Plaintiffs' expert evidence." *See also* Br. 21, 25-31, 37, 39, 43-45. However, Defendants never argued below that the district court should resolve disputes about the persuasiveness of Plaintiffs' expert analysis or Defendants' criticisms of that analysis. They argued that the court should take a "hard look at the soundness of statistical models" and that Plaintiffs' models were "fatally flawed." Dkt. 397 at 19. But they did not argue that the court should go a step further to consider not only whether the model was sound and not fatally flawed, but whether the model or Defendants' criticisms were ultimately persuasive. The argument is therefore waived. *See, e.g.*, *Kearns v. Cuomo*, 981 F.3d 200, 212 n.8 (2d Cir. 2020) ("In accordance with our usual practice, we decline to address arguments not raised below."). In any event, Defendants' argument is meritless as a matter of law and logic.

24

### 1. Defendants' Demand For The District Court To Resolve All Expert Disputes On Class Certification Defies Binding Precedent

Precedent from the Supreme Court, this Court, and other circuits confirms that Defendants' theory that the court must "resolve" expert disputes on class certification—even when the district court determines that the plaintiff's model is capable of showing classwide impact—is meritless.

*First*, Supreme Court precedent forecloses Defendants' argument. The Supreme Court has held unequivocally that the question of whether common evidence ultimately will persuade the jury is *not* a legitimate basis to deny class certification. "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be *answered*, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (second emphasis added). Defendants ignore this dispositive holding.

Defendants attempt (Br. 34 n.7) to distinguish *Amgen* because it concerns the element of materiality in securities class actions, but *Amgen* did not state or imply that this was a special rule for materiality. And the Supreme Court has held repeatedly that the question is whether an issue is "capable of classwide resolution," *Wal-Mart*, 564 U.S. at 350, or "susceptible to generalized, class-wide proof," *Tyson*, 577 U.S. at 453 (quotation marks omitted). Whether an issue is "capable" or "susceptible" to classwide resolution depends on whether a reasonable jury could

25

accept the classwide evidence, not on whether the judge believes the jury will ultimately resolve that classwide issue in favor of the plaintiffs.

According to Defendants (Br. 34 n.7), materiality is different because a decision on materiality will apply to the whole class, win or lose. But that is exactly the point: The predominance inquiry is about whether the issue will be resolved on a classwide basis, not whether the class will prevail on the issue. Here, the disputes that Defendants want the district court to resolve are *all* ones that will apply exactly the same way for the entire class. For instance, Defendants claim (Br. 25, 38, 40-48) the district court should resolve the dispute over whether Plaintiffs' models produce false positives or nonsensical results, and more generally whether Plaintiffs' expert model is persuasive. But whether the model is persuasive is true or false for *all* class members. The model does not use the right variables for one class member and the wrong variables for another—it applies equally to determine the existence of injury and damages for all class members.

Moreover, *Tyson* applied the principle in *Amgen* outside of the materiality context, specifically to disputes over expert analysis. In *Tyson*, the plaintiffs relied on an expert study to show that the class did not receive statutorily mandated overtime pay for time spent donning and doffing protective equipment. 577 U.S. at 446. The defendant argued that the plaintiffs' "study manufactures predominance" because "[r]eliance on a representative sample … absolves each employee of the

responsibility to prove personal injury, and thus deprives petitioner of any ability to litigate its defenses to individual claims." *Id.* at 454. The Supreme Court rejected the defendant's argument, holding that whether the data were sufficiently representative is a question for *Daubert*, summary judgment, or ultimately for the jury—but not for class certification. In particular, the Court noted that "[r]easonable minds may differ as to" the merits of the challenges to the expert evidence, but "*[r]esolving that question … is the near-exclusive province of the jury*." *Id.* at 459 (emphasis added). In short, "[o]nce a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury." *Id.* This reasoning is dispositive here: Defendants' criticisms of the persuasiveness of Plaintiffs' expert evidence is a jury question, *not* a question to be resolved on class certification.

Defendants argue (Br. 37-38) that *Tyson*'s statement about deferring to the jury concerned "pure merits questions," but that is false. The defendants in *Tyson* argued that the failure of the plaintiffs' expert analysis meant that the individualized nature of employees' donning and doffing times defeated predominance. 577 U.S. at 454. *Tyson* never said that it concerned a merits question (let alone a "pure" merits question)—plainly it did not. Rather, *Tyson* held that "[t]he District Court could have denied class certification on this ground," but "only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing." *Id.* at 459. Defendants do not argue—nor could they—that

they satisfy the standard that "no reasonable jury" could believe Plaintiffs' expert analysis.

Defendants also err in arguing (Br. 38) that *Tyson* is limited to the situation where an "evidentiary gap" leaves the plaintiffs with "no alternative means" of proving injury. *Tyson* noted this gap, but did not remotely suggest that it was a limitation on its holding. Rather, the critical question is not *why* the class members relied on the classwide evidence but *whether* they could rely on that evidence if it were an individual action.

> One way for respondents to show … that the sample relied upon here is a permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action. If the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action, that sample is a permissible means of establishing the employees' hours worked in a class action.

577 U.S. at 455. Thus, "[t]he underlying question" is whether the evidence at issue could be used "to establish liability in an individual action." *Id.* at 458.

Here, the district court found that individual plaintiffs could rely on the classwide evidence: "Even if Defendants are correct that VRDO rate-setting was an individualized process involving multiple factors, each class member could rely on Dr. Schwert's and Dr. Abrantes-Metz's testimony to support a finding of antitrust liability in a hypothetical individual action. That is sufficient at this stage." SPA23. Defendants do not contest this finding, and under *Tyson*, it is dispositive. In any

28

event, Defendants are also wrong to suggest (Br. 38) (as they failed to argue below) that class members could rely on individualized evidence to prove their claims. To prove injury, any individual plaintiff must show what the particular VRDO rates would have been in the but-for world absent the conspiracy. And there is no way to show the rates in the but-for world without a model or analysis of the market as a whole, as Plaintiffs' experts have performed. As for how a class trial would proceed, and contrary to Defendants' suggestion (Br. 35), if the jury does not accept Plaintiffs' experts' showing of injury to the class, there is no confusion about the result: the jury would find no liability and the class would not recover because there would be insufficient evidence of (and the jury would not be asked about) injury to individual class members.

Finally, the other Supreme Court cases Defendants mention are inapposite. Defendants cite *Comcast*, but *Comcast* rejected a damages model only because it was not tied to the theory of liability. 569 U.S. at 35-36; *see also, e.g.*, *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (recognizing this "narrow[]" holding of *Comcast*); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013) ("Plaintiffs' proposed measure for damages is thus directly linked with their underlying theory of classwide liability … and is therefore in accord with [*Comcast*]."). It is undisputed that Plaintiffs' expert models here are tied to the theory of liability.

Defendants also cite *Goldman Sachs Group v. Arkansas Teachers Retirement System*, 594 U.S. 113, 126-27 (2021), but *Goldman* did not concern the evaluation of expert evidence at class certification and thus did not mention *Daubert* or *Tyson*, let alone cabin *Tyson*'s holding. Instead, *Goldman* held that, in securities class actions, the *Basic* presumption to prove reliance must be established at the certification stage.[2] The reason is simple: "without the *Basic* presumption, individualized issues of reliance ordinarily would defeat predominance." *Id.* at 119.

Thus, the *Basic* presumption is a special mechanism to allow securities class actions where the plaintiffs otherwise would be unable to prove reliance on a classwide basis, and the plaintiffs therefore must show entitlement to that presumption or else proceed individually and prove actual reliance on the alleged misrepresentations.[3] This reasoning regarding a special presumption for securities class actions says nothing about requiring plaintiffs to prove the actual elements of

---

[2]   In *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988), the Court held that plaintiffs in securities class actions may invoke a presumption that class members relied on the alleged fraud based on a fraud-on-the-market theory. The premise of that theory is that "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).

[3]   Indeed, there is nothing preventing an individual from showing he or she actually relied on a misrepresentation based on individualized evidence (e.g., testimony or documents showing what he or she read). In contrast, as discussed *supra* at 29, it is not feasible for an individual to eschew common evidence of injury here.

the claim at class certification. Indeed, with the exception of materiality, the requirements for the *Basic* presumption are *not* elements of a securities fraud claim. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282 (2014) ("[A] failure to prove materiality would necessarily defeat every plaintiff's claim on the merits; it would not simply preclude invocation of the presumption and thereby cause individual questions of reliance to predominate over common ones. In this latter respect, we explained, materiality differs from the publicity and market efficiency prerequisites, neither of which is necessary to prove a Rule 10b-5 claim on the merits." (internal citations omitted)). And there is no requirement to prove the element of materiality at the class-certification stage. *Id.* at 282-83. Here, likewise, there is no requirement to prove the element of injury at the class-certification stage, but rather that injury is capable of proof on a classwide basis.

Notably, Defendants cite no case applying *Goldman*'s discussion of proof at class certification outside the context of the *Basic* presumption. And Defendants' argument would prove far too much: If *Goldman* did apply to every element of a claim, then plaintiffs would be required to prove their claims by a preponderance of the evidence at class certification (as they do for the *Basic* presumption)—in clear defiance of *Amgen*, *Tyson*, and fundamental principles of law requiring deference to the jury.

31

*Second*, this Court's precedent likewise refutes Defendants' theory. In *In re U.S. Foodservice Inc.*, the defendant "challenge[d] the district court's reliance on the plaintiffs' damages expert," and this Court held that the reliance was justified. 729 F.3d at 129-30. The court "considered the admissibility of the expert testimony," and it made "the requisite findings" by concluding that the expert "appropriately" modeled injury and damages for the class. *Id.* at 130. Similarly, in *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61-63 (2d Cir. 2020), the defendant challenged the plaintiffs' expert's methodology for determining classwide injury and damages. This Court held: "A factfinder may ultimately agree. But if that is the case, then the class claims will fail as a unit. … Accordingly, the district court did not abuse its discretion in concluding that class issues predominate." *Id.* at 62-63 (citing, *inter alia*, *Tyson*, 577 U.S. at 455). Thus, *In re U.S. Foodservice* and *Kurtz* confirm that the district court here performed the correct analysis in examining admissibility and predominance of common issues, but not whether Plaintiffs' experts were ultimately more persuasive than Defendants'.

The cases Defendants cite pre-date *Tyson* and, regardless, none supports their position. Defendants cite (Br. 26-28) *Teamsters Local 445 v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir. 2008), and *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006), but both concern the requirements for the *Basic* presumption,

which is inapposite here. *See supra* at 30-31.[4] Indeed, when discussing expert testimony more generally, *Teamsters* stated that "[a]n event study may be rejected … if it is methodologically unsound or unreliable," *i.e.*, if it fails *Daubert*. 546 F.3d at 208 n.15. And *In re IPO* stated that expert evidence must not be "fatally flawed," 471 F.3d at 36, which this Court explained (outside the *Basic* presumption context) required no more than *Daubert* analysis. *In re U.S. Foodservice*, 729 F.3d at 129-30 (discussing *In re IPO*).[5]

*Third*, other circuits' case law further belies Defendants' argument. The Ninth Circuit recently held that "a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Olean*, 31 F.4th at 667; *see also Lytle v. Nutramax Lab'ys, Inc.*, 99 F.4th 557, 571-72 (9th Cir. 2024) ("Requiring that class action plaintiffs actually prove classwide injury at this stage would improperly conflate the class certification inquiry with the merits. … Nutramax argues that the theoretical possibility Dr. Dubé's model, once

---

[4]   The same is true for another case Defendants rely upon (Br. 29-31), *West v. Prudential Securities, Inc.*, 282 F.3d 935, 938 (7th Cir. 2002).

[5]   Defendants also cite (Br. 28) *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010), but in that case, the Court recognized the admissible, common expert evidence regarding injury, and the Court affirmed denial of class certification for the separate reason that reliance could not be determined on a classwide basis. *Id.* at 133-36. There is no issue of reliance here.

executed, might show no injury at all 'goes to the heart of the Rule 23 inquiry.' But Nutramax fails to convincingly explain why this is so.").[6]

The D.C. Circuit likewise has held that "Defendants' contention that their model showing unharmed members is more accurate and credible than Plaintiffs' different models showing that all members were harmed is thus precisely the kind of material factual dispute that is better suited for adjudication of plaintiffs' injury and damages on the merits." *Nat'l ATM Council v. Visa Inc.*, 2023 WL 4743013, at *11 (D.C. Cir. July 25, 2023) (cleaned up) (citing *Tyson*, 577 U.S. at 457).[7]

---

[6] Defendants cite (Br. 29-30) *Ellis v. Costco Corp.*, 657 F.3d 970 (9th Cir. 2011), but the Ninth Circuit has recognized that *Ellis* is limited to disputes about "historical facts" and does not apply to expert disputes. *Olean*, 31 F.4th at 667.

[7] Like with their citation to *Ellis* in the Ninth Circuit, Defendants cite (Br. 30 n.4) older cases that the D.C. Circuit distinguished for reasons equally applicable here. *See Nat'l ATM Council*, 2023 WL 4743013, at *10-11; *see also In re Rail Freight Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("*Rail I*") (the plaintiffs' model "detect[ed] injury where none could exist" and thus was not a "reliable means of proving classwide injury"); *In re Rail Freight Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019) ("*Rail II*") (Plaintiffs' expert's *own* model showed "2,037 members of the proposed class—or 12.7 percent—suffered 'only negative overcharges' and thus *no* injury from any conspiracy"). And *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018), is inapposite for the same reason as *Rail Freight II*, as in *Asacol* (unlike here), "the reports of both sides' experts" made clear that "approximately ten percent of class members had not been injured by [the defendant's] allegedly anticompetitive conduct." 907 F.3d at 46-47; *see also* SPA24. The district court correctly found that "the record here is a far cry from the records in *Rail II* and *Asacol*" because Dr. Schwert found that 99.3% of VRDOs were harmed, SPA24, and distinguished *Rail I* on the grounds that Defendants failed to identify "systemic false positives" in Dr. Schwert's models, SPA14.

Similarly, the Third Circuit held, when discussing an expert model, that the defendant "may ultimately be correct that this evidence is 'unrepresentative or inaccurate.' But '[t]hat defense is itself common to the claims made by all class members,' and so supports class certification." *Hargrove v. Sleepy's LLC*, 2023 WL 3943738, at *3 (3d Cir. June 12, 2023) (quoting *Tyson*, 577 U.S. at 457).[8]  And the Eleventh Circuit also has held, for a factual dispute over a damages methodology, that "[a]t the class certification stage, all that the named plaintiffs had to prove was that a reliable damages methodology existed, not the actual damages plaintiffs sustained." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023). In short, other circuits consistently reject Defendants' position that district courts must decide the persuasiveness of expert evidence on class certification even after finding that the plaintiffs' model is reliable under *Daubert* and capable of showing classwide impact.  This Court should do the same.

---

[8]  While the Third Circuit cases Defendants cite (Br. 30) require scrutiny of expert evidence, they do not hold such scrutiny requires the court to decide which side's expert is more persuasive.  *See In re Lamictal Direct Purchasers Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) ("It was up to the District Court to scrutinize the evidence to determine what was *credible* and could be used in the expert analysis." (emphasis added)); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 322 (3d Cir. 2008) (vacating certification where the district court failed entirely to address a criticism of the plaintiffs' expert opinions).

**2.**   **Defendants' Demand For The District Court To Resolve All Expert Disputes Is Logically Incoherent And Conflicts With Black-Letter Legal Principles**

In addition to conflicting with precedent, the very premise of Defendants' argument is nonsensical.  The district court cannot actually "resolve" the battle of the experts on the issues of injury and damages because the jury still gets to decide these issues, whatever the court believes.  It is well established that "[t]he determination as to a Rule 23 requirement … is not binding on the trier of fact" in its determination of the merits.  *Cordes*, 502 F.3d at 108 n.13 (alteration in original); *see also Mazzei v. Money Store*, 829 F.3d 260, 268 (2d Cir. 2016) (same).  Simply put, the jury must decide the facts and the judge (outside the context of deciding summary judgment or admissibility of evidence) cannot do so.  That is why *Tyson* emphasized the role of the jury and the application of the same "no reasonable juror" test that applies on summary judgment in every case.  577 U.S. at 459 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986), a Rule 56 case that did not involve a class action).  Thus, whether the district court believes that Plaintiffs' expert analysis is more or less persuasive than Defendants' cannot bind or preempt the jury and does not affect the evidence that would be put before the jury.  The district court's view on persuasiveness is, therefore, entirely *irrelevant* to

whether common issues predominate, as it does not affect whether the jury can resolve the issues on a classwide basis.[9]

Defendants' approach also would violate the Rules Enabling Act, 28 U.S.C. § 2072, by subjecting otherwise admissible evidence to an additional persuasiveness requirement simply because it is classwide (instead of individual) evidence. "Rule 23's requirements must be interpreted in keeping … with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Amchem*, 521 U.S. at 613 (quoting 28 U.S.C. § 2072(b)). This principle prevents courts from treating classwide evidence any differently than individual evidence: "In a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class. To so hold would ignore the Rules Enabling Act[] …." *Tyson*, 577 U.S. at 455. Defendants' proposal to create an additional persuasiveness hurdle for expert evidence in a class action would thus violate the Rules Enabling Act.

---

[9]  This point also disposes of Defendants' concern (Br. 35-36) that the jury might conclude that Plaintiffs' expert analysis is erroneous. Having the judge decide persuasiveness would not fix this supposed problem. Because the court's view on persuasiveness does not bind the jury, regardless of what the court believes, the jury could still decide that Plaintiffs' expert analysis is persuasive (or not). In any event, as discussed *supra* at 29, if the jury disbelieves Plaintiffs' experts, that does not undermine the class certification; it simply means Defendants may prevail on the merits.

Finally, contrary to Defendants' suggestion (Br. 40), even if this Court were nonetheless to adopt a different legal standard for review of expert classwide evidence, the district court should apply that standard in the first instance. *See In re Petrobras Sec.*, 862 F.3d 250, 274-75 (2d Cir. 2017) ("Our purpose is merely to outline the contours of the robust predominance inquiry that Rule 23 demands. We leave the adjudication thereof to the district court in the first instance."); *Haley v. Teachers Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 121 (2d Cir. 2022) ("Because the district court determined that predominance was satisfied without analyzing the § 408 exemptions or TIAA's claimed variations among the loans, we vacate and remand for it to undertake that inquiry in the first instance."). That is especially true given the detailed, factual nature of the inquiry. *See Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016) ("Factfinding is the basic responsibility of district courts, rather than appellate courts, and the Court of Appeals should not resolve in the first instance a factual dispute which has not been considered by the District Court." (cleaned up)).

### C. The District Court Acted Well Within Its Discretion In Rejecting Defendants' Criticisms Of Plaintiffs' Expert Evidence As A Basis To Deny Class Certification

Defendants raise (Br. 40-51) several criticisms of Plaintiffs' expert opinions, but the district court correctly found—and certainly did not abuse its discretion in finding—that none defeats predominance. Defendants' criticisms only confirm the

classwide nature of the inquiry here, as they rest almost entirely on common evidence that the jury would address on a classwide basis by concluding that Plaintiffs' experts' models are right or wrong—a conclusion that would apply equally to everyone in the class. The district court accordingly recognized that Defendants' criticisms can be decided on a common basis based on classwide evidence. SPA22-23. And, as Defendants recognize (Br. 37-38, 56-57), where "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity … courts should engage that question as a matter of summary judgment, not class certification." *Tyson*, 577 U.S. at 457.

Defendants' criticisms also highlight the absurdity of the inquiry that they believe the district court must perform. According to Defendants, the court must determine the persuasiveness of the evidence regarding every variable in the plaintiffs' experts' models, and if it disagrees with the inclusion or exclusion of any variable, then a class cannot be certified. There is no legal basis for the judge to decide what constitutes a supposedly perfect econometric model for a given case, and creating such a requirement would make class certification all but impossible.

In any event, the district court rigorously examined Defendants' critiques, and none withstands scrutiny.

*First*, Defendants argue (Br. 40-42) that Dr. Schwert's models generate so-called "false positives," but the district court correctly rejected Defendants'

argument. The court noted that "[f]alse positives can indeed be fatal to a model," but Defendants "do not point to evidence of systemic false positives produced by Dr. Schwert's models." SPA14. Defendants' suggestion (Br. 40-41) that Dr. Schwert's models generate false positives "for nearly all VRDOs" when the models "are applied to the five-year clean period that follows the allege conspiracy period" is incorrect. As the court explained, it was Defendants' *own* expert's re-working of Dr. Schwert's models, SPA15, inexplicably using different slices from Dr. Schwert's clean period to estimate coefficients for Dr. Schwert's explanatory variables, JA2401-03, that found so-called false positives.

Moreover, Defendants argue (Br. 40-41) that Dr. Schwert's models generate false positives at the onset of the COVID pandemic, but still fail to explain why false positives during "less than 1% of the total conspiracy and non-conspiracy time period" and "*wholly outside* of the alleged conspiracy period" doom Dr. Schwert's models. SPA16. Defendants contend (Br. 41) that the district court "misunderst[ood] the record" in "assum[ing] that March 2020 is the *only* month in the clean period in which the models generate false positives." Not so. Defendants continue to point to their *modified* versions of Dr. Schwert's models, JA2401-03, as opposed to Dr. Schwert's actual models, which do not predict any systematic rate inflation outside of March 2020, JA1938. Defendants also suggest (Br. 41-42) March 2020 has special importance because it concerned extreme economic

conditions in the clean period, and the "*entire [conspiracy] period* was a period of extreme economic conditions." But, as the district court correctly found, SPA11, Dr. Schwert controlled for these macroeconomic conditions, JA1899-908, and demonstrated that his results are not sensitive to the inclusion of periods of financial distress, JA1909-14.

*Second*, Defendants argue (Br. 42-44) that Dr. Schwert's models produce nonsensical results because they estimate that VRDO rates were inflated on certain days where VRDO inventory was also high, but the district court correctly found that "Defendants offer no reason why these positives are false." SPA15 (quotation marks omitted). As the court explained, Plaintiffs "offered reasonable explanations" for why VRDO rates would be inflated when inventory is high. *Id.* Indeed, these results are fully consistent with the VRDO market's structure and the purpose of the conspiracy. JA2075-80. As Dr. Abrantes-Metz explained, during periods of high inventory, Defendants had an increased incentive to conspire to inflate rates to remove VRDOs from their balance sheets. *Id.* Regardless, Dr. Schwert showed that his results are not sensitive to the inclusion of periods of high inventory by running an alternative analysis removing those periods from his models. JA1909-14.

Defendants point to (Br. 42) two specific bonds of the Named Plaintiffs that they claim show "nonsensical results," but these provide only a snapshot of the percent of a VRDO held in inventory and the inflation rate on a given day. These

snapshots thus ignore the key question—whether Defendants' increasing the rates for that VRDO allowed Defendants to remarket the bond in the next few weeks, removing it from their inventory. JA2525. Defendants assert (Br. 42) that counsel's assertions that these examples are misleading snapshots lacks evidentiary support, but they simply ignore the evidence. JA2525-26. That evidence shows that Defendants cherry-picked a few given moments in time; that for many of Defendants' examples, Defendants successfully remarketed the bond after increasing the rates; and that for others, the snapshot merely reflected a reissuance of a bond (which requires a mandatory tender); or Defendants misleadingly point to high inflation percentages when the actual VRDO rates were low. *Id.*; *see also* JA1909-14 (Dr. Schwert's results are not sensitive to the inclusion of periods of high inventory); JA1976 (one of the bonds was downgraded or put on credit watch, events captured by Dr. Schwert's models).

*Third*, Defendants argue (Br. 44) that Dr. Schwert's models "mistake the effects of extreme economic conditions for the effects of the alleged conspiracy." However, the district court found that Dr. Schwert *does* control for macroeconomic conditions "by using the commercial paper premium and municipal bond premium variables." SPA11; JA1899-902. Defendants' argument is thus not that Dr. Schwert did not control for macroeconomic conditions at all, but rather that he did not do so

42

in the manner they would prefer.  The district court correctly found that these "squabbles are more appropriately resolved later in the litigation."  SPA11.

In any event, Defendants' argument that Dr. Schwert's models fail to control for macroeconomic conditions is baseless.  Defendants argue (Br. 45) that the Federal Reserve's suppression of commercial paper rates during the financial crisis caused Dr. Schwert's models to mistake suppression of commercial paper rates with inflation of VRDO rates, but (as the district court correctly noted) the Federal Reserve's Commercial Paper Funding Facility did not reduce the commercial paper *premium*—the actual variable Dr. Schwert used—below pre-financial crisis levels.  SPA13; JA1964-65 n.136, 1900-01.  Defendants also argue (Br. 45) that the financial crisis and European Sovereign Debt Crisis affected VRDOs more severely than commercial paper and long-term municipal bonds, but VRDO rates were, on average, low during the European Sovereign Debt Crisis.  JA1900-02.  Furthermore, Dr. Schwert also included other variables that capture VRDO-specific risk, like VRDOs' long-term and short-term ratings, JA1902-07, and his results are not sensitive to the inclusion of additional measures of VRDO-specific risk, JA1917-27.  Finally, Defendants assert (Br. 45) that the relationship between VRDO rates, on the one hand, and commercial paper rates and long-term municipal bond rates, on the other, was distorted and unstable.  But as the district court correctly found, Dr. Schwert "shows that the precise relationship between commercial paper and

municipal bond rates does not affect the predicted VRDO rates."  SPA12; *see also* JA1914-17.

*Fourth*, Defendants argue (Br. 46-48) that Dr. Schwert's selection of a long-term municipal bond rate rather than a short-term municipal bond rate as a control variable masks purportedly unharmed class members.  But the district court properly found Dr. Schwert's explanations for his selection of explanatory variables was sufficient, and Defendants' alternative models "produce[d] damages that make no economic sense," SPA12-13—namely, enormous *negative* damages in 2008. JA1961-63.  Indeed, Dr. Hubbard never evaluated whether the predictions of his alternative models made economic sense.  JA1945 n.111, 2214.[10]  As Dr. Schwert explained, to measure "the risk that the liquidity provider will not be able to pay its obligations if the issuer does not," he used a "commercial paper premium" variable. JA138.  And to measure "the risk that the VRDO's issuer will not be able to pay its obligations," Dr. Schwert used a "municipal bond premium."  JA138-39.  But the

---

[10]  Dr. Hubbard uses a "harm as a whole" test, under which a VRDO is harmed only if the sum of the positive injury and negative injury across all resets is positive. JA1755-56, 2428.  He finds that a large share of VRDOs were unharmed using his modified models only because the large negative damages he estimates in 2008 more than offset the positive damages he estimates for the rest of the conspiracy period. JA1947-48.  But the law is clear that an  "antitrust injury occurs the moment the purchaser incurs an overcharge, *whether or not that injury is later offset*."  *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 557 (S.D.N.Y. 2021) (emphasis added) (citation omitted); *accord id.* at 557-58 (collecting cases).

short-term municipal bond premium captures neither. JA1961. And Defendants' chart (Br. 47) purporting to show that VRDO rates track the short-term municipal index more closely than the long-term municipal index is a red herring because Dr. Schwert uses the ratio of the long-term municipal bond rate to the risk-free rate rather than the long-term municipal bond rate itself. JA2257-60.

Defendants wrongly claim (Br. 47) that "it is undisputed that adding a short-term index is appropriate" because Plaintiffs "cited no reasons for *excluding* a short-term index." Dr. Schwert did not have the opportunity to address that specific modified model because Dr. Hubbard did not introduce it until his reply report. *Compare* JA1774-75, *with* 2427-28. And Dr. Hubbard does not even claim that including a short-term municipal bond variable in addition to a long-term municipal bond variable fixes the nonsensical negative damages problem associated with his other modified versions of Dr. Schwert's models.

*Finally*, Defendants' criticisms (Br. 48-51) of Dr. Abrantes-Metz are likewise unavailing. Defendants argue (Br. 49) that Dr. Abrantes-Metz merely assumes that the alleged conspiracy inflated base rates. But Defendants ignore Dr. Abrantes-Metz's market structure analysis, which shows that if Defendants engaged in the alleged conspiracy, the conspiracy would be effective in inflating base rates. JA259-98. As the district court noted, "[s]imilar market analyses have

been accepted by courts as a source of common evidence of impact." SPA17 (collecting cases).

As for Dr. Abrantes-Metz's base rates study, Defendants assert (Br. 50) that many VRDOs were not set with reference to a base rate, but the district court correctly explained that "[t]here is ample evidence in the record that Defendants referenced base rates when setting VRDO rates." SPA18. Dr. Abrantes-Metz systematically evaluated the qualitative economic evidence from each Defendant and concluded that each set prices by using a base rate as a starting point. JA300-01 (Bank of America), 301-302 (Barclays), 303 (Citi), 303-304 (Goldman Sachs), 304-305 (JPMorgan), 305-306 (Morgan Stanley), 306-307 (RBC), 307-09 (Wells Fargo). Defendants' argument (Br. 50) that Dr. Abrantes-Metz fails to prove "formulaic[]" tying of base rates and VRDO rates misses the point—if the starting point was inflated, the end point is inflated as well. JA2050-54; *see also Olean*, 31 F.4th at 677-78 ("It is not implausible to conclude that a conspiracy could have a class-wide impact, 'even when the market involves diversity in products, marketing, and prices,' especially 'where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations.'" (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014))).

Defendants mischaracterize (Br. 50) Dr. Abrantes-Metz's opinion in claiming she uses an improperly expansive definition of base rate. Dr. Abrantes-Metz merely

noted that Defendants themselves used a variety of terms for their base rates, such as "general market rate." JA2013. She further noted that rate setters considered factors such as external benchmarks, but "[t]o suggest that rate setters would consider these myriad factors, but not consider a 'base rate' or 'general market' rate that was listed prominently in their own rate-setting materials, mischaracterizes the record evidence." *Id.* Indeed, the idea that Defendants did *not* consider their internal reference points is belied by the fact that they shared that reference point with one another through the Weekly High-Grade Index. *See supra* at 5-6.

Defendants also argue (Br. 51) that Dr. Abrantes-Metz admitted that her correlation analysis cannot prove causation, but this too grossly mischaracterizes Dr. Abrantes-Metz's opinion. Dr. Abrantes-Metz explained that the quantitative component of her base rate study does not *independently* demonstrate that the conspiracy caused inflated VRDO rates, but her rate study as a whole—including the qualitative component—shows that *if* Defendants inflated base rates (an issue that unquestionably can be decided on a classwide basis), then the conspiracy would inflate *all or virtually all* VRDO rates. JA298-331, 2008-13. And while Defendants claim that the observed correlation between base rates and VRDO rates is explained by both rates responding to common market factors, Dr. Abrantes-Metz explicitly controlled for those factors and reached the same conclusion. JA2025-29.

### D. The District Court Acted Well Within Its Discretion In Finding That Defendants' Evidence Does Not Defeat Predominance

Defendants mischaracterize the district court opinion in arguing (Br. 4) that the court did not "consider both sides' evidence." In fact, the court considered *all* of the evidence and discussed Defendants' evidence at length in concluding that common issues would predominate despite the existence of some individualized evidence that Defendants put forward. SPA19-30. This balance of common and individualized issues is fundamentally a discretionary judgment, and this Court has held that the district court receives substantial deference in making this judgment. *See, e.g.*, *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 89 (2d Cir. 2015) ("They merely quibble with the district court's assessment that, on balance, these ultimate issues of liability outweigh the individualized concerns that they raise. On reviewing the district court's certification order, this is not a sufficient contention on which we may rely to conclude that the district court abused its discretion in certifying this class."). Indeed, this Court specifically recognized that "the predominance question … is best left to the sound discretion of the district court" even where the question "whether a particular plaintiff would have paid more in the but-for world[] may not be common," and "[p]erhaps a trial would focus largely on what particular plaintiffs would have paid in the but-for world." *Cordes*, 502 F.3d at 108. Defendants ignore

this standard and provide no basis to question the district court's discretionary judgment here.

Predominance is a "comparative standard: 'Rule 23(b)(3) [] does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members.'" *In re Petrobras*, 862 F.3d at 268 (emphasis in original) (quoting *Amgen*, 568 U.S. at 469). However, as the district court found, "Defendants offer[ed] no counter-estimate of how many individualized inquiries would be required." SPA24. Given Defendants' failure to estimate the number of individualized inquiries that would be necessary, the district court correctly found there was no basis to conclude that they would overwhelm the common issues in this case. *Id.*

Defendants assert (Br. 52, 59) that their expert, Dr. John Chalmers, offered individualized evidence about why the conspiracy did not affect the named Plaintiffs' VRDOs and certain other VRDOs. The district court noted this evidence, and (assuming *arguendo* it meets the requirements for admissibility) there is nothing that prevents Defendants from putting forward that evidence at trial. SPA22-25. For the named Plaintiffs' VRDOs, the experts' opinions plainly are not too extensive to be presented at trial (and, presumably, they would be presented if there were an

individual action).[11] For all of the other VRDOs that Defendants' experts analyzed, Defendants point to (Br. 52) only about a dozen pages from Dr. Chalmers's report that certainly would not predominate over the classwide evidence at trial. JA785, 807-09, 896-903.

Defendants' real concern seems to be that they may want to put forward individualized evidence about *every* VRDO, but Defendants failed to make such a showing in the district court. While Defendants' brief repeatedly refers (Br. 3, 22, 52-53) to "thousands" of individualized inquiries, that is not an argument that Defendants' experts developed below, as the district court found. SPA24. And to the extent Defendants suggest (Br. 53) that their experts said that "Defendants can make thousands more such showings that the rates of individual VRDOs were not inflated," the page that Defendants cite says nothing of the sort. JA2421.

Defendants mischaracterize (Br. 57) the district court as supposedly requiring Defendants "to quantify the precise number of individualized inquiries that would be necessary." The district court did not require a precise number. Rather, it required some basis for an estimate of the individualized inquiries—as needed to

---

[11]    Defendants suggest (Br. 53) that "Plaintiffs did not contest *a single one* of Defendants' nineteen individualized showings of non-injury for VRDOs issued by the named plaintiffs," but the page they cite is from their own experts' reply report, which in fact recognizes that Dr. Schwert did respond by explaining that "his models account for the individualized factors." JA2421; *see also* JA1970.

demonstrate that they overwhelm common issues—and Defendants failed entirely to provide one. SPA24. The idea that some estimate was necessary follows from the fact that predominance is a comparative standard and from the Supreme Court's holding a defendant's "attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton*, 573 U.S. at 276.

Defendants also err in asserting (Br. 58) that the district court "improperly flipped the burden of proof." The court held unequivocally that Plaintiffs had the burden to prove predominance and found that Plaintiffs satisfied that burden. SPA5, 30. To the extent Defendants suggest (Br. 57-58) that this burden requires Plaintiffs to disprove the existence of thousands of hypothetical individual inquiries that Defendants never identified, that is facially absurd. As the district court explained, Plaintiffs met their burden by putting forward evidence showing that "*virtually all* VRDOs had their rates inflated at least once during the conspiracy period," SPA9, and explaining why the issues could be decided on a classwide basis despite the existence of some individualized evidence that Defendants identified, SPA22-23. Defendants rely (Br. 54-55, 57-58) on *Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023), for the proposition that when a defendant provides "illustrative examples," the plaintiff must show an assessment of each specific class member will be unnecessary or unworkable. But in *Van*, the examples concerned evidence

undisputedly showing some class members were uninjured and *additional* evidence showing that thousands more were likely uninjured because "13,680 discounts were provided to class members" that could have offset any supposed injury and that would require individualized inquiry regarding the nature of the discount. *Id.* at 1069. Here, in contrast, Defendants produced no individualized evidence to suggest that a significant percentage of the class was uninjured.[12]

Moreover, Defendants failed to show why it would be necessary—or even relevant—to introduce individualized evidence beyond what it identified about the relatively small number of VRDOs their experts individually analyzed. Plaintiffs presented at class certification (and would present at trial) expert evidence common to the class showing injury to all or virtually all class members. *See supra* at 7-10. Defendants can criticize Plaintiffs' expert analysis, which they do with their own common evidence. *See supra* at 38-47. While Defendants also can put forward

---

[12] The other cases Defendants rely upon (Br. 61) are likewise inapposite and reflect deference to the district court on the fact-specific question of predominance. *See Johannessohn v. Polaris Indus., Inc.*, 9 F.4th 981, 985 (8th Cir. 2021) ("This will require individualized findings on reliance and is likely to make for multiple mini-trials within the class action. Because these fact issues will predominate, the district court was within its discretion to deny the motion for class certification on this basis."); *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 92 (1st Cir. 2021) ("[W]e see no abuse of discretion in the district court's finding" that common issues did not predominate where the plaintiff "has made no argument that the court could cull from the class" those undisputedly uninjured "in an administratively feasible way ….").

individualized evidence, the jury will not be asked and will not answer whether any particular class member suffered injury. Thus, the individualized evidence is relevant only to the extent the jury believes that it undermines Plaintiffs' model. If the jury believes the model, then the jury can find injury to the class; if it does not, then the jury can find no injury to the class. And the models (by their terms) already account for the supposedly individual issues that Defendants raise by including those factors within the models. JA139-40, 1902-08, 2025-29, 2038-39, 2047. Thus, there is no plausible scenario where the jury needs to understand the details of thousands of VRDOs. Rather, the jury can look at the model, the criticisms of the model, and the evidence regarding the details of a few dozen VRDOs Defendants identified on class certification to determine whether the model properly accounts for supposedly individual issues and shows injury to all or virtually all class members.

Furthermore, Defendants' argument (Br. 61-62) regarding synthetic-fixed-rate transactions is baseless. Defendants ignore the district court's reasoning on this point: "Defendants have not come close to identifying which or how many class members were never exposed to interest overcharges on account of their participation in swaps. And their vague observation that 'many issuers' entered into synthetic fixed rate transactions, without more, is not enough to overcome Plaintiffs' expert testimony establishing the existence of classwide injury." SPA26 (citation omitted). Defendants claim (Br. 59-61) that they presented evidence of

many class members entering into swaps. But they presented no evidence that these swaps fully offset the injury to any particular number or percentage of class members. In fact, Dr. Schwert explained that Dr. Chalmers identified just *one* issuer that only issued VRDOs associated with cost-of-funds swaps where the swap amount was equal to the VRDO issuance amount. JA1983. For other synthetic-fixed rate transactions, swaps do not fully insulate issuers from VRDO rate inflation. JA1982-85. Accordingly, the district court found that "Defendants fail to chip away at predominance with even a ballpark estimate of how many class members are likely to be uninjured on account of their participation in swaps, let alone by making a definitive showing of no injury for a particular plaintiff." SPA27 (cleaned up). That is why the district court found that the issue concerned (at most) damages, not injury—because there was no evidence that swaps brought damages to zero, thereby making class members uninjured. *Id.* In any event, even in that scenario, there still would be injury under the antitrust laws pursuant to *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968).[13]

---

[13] Defendants assert (Br. 53 n.10) that the district court implicitly decided this issue in their favor, but in fact the court held that it "need not and does not reach Plaintiffs' argument that Defendants' unitary-transaction theory is foreclosed by the Supreme Court's decision in *Hanover Shoe*." SPA27 n.7. There is likewise no reason to reach the issue here. In any event, Defendants' suggestion that swaps and VRDO bonds must be considered part of one transaction is wrong as a matter of law and inconsistent with the record evidence. *In re Elec. Books Antitrust Litig.*, 2014 WL (continued on next page)

Finally, Defendants' argument (Br. 53) that individual defenses defeat certification if "a reasonable jury could find them persuasive" (while Plaintiffs must meet a higher bar for their classwide evidence) demonstrates just how extreme Defendants' position is. A defendant can almost always present some defense for some class members that could survive summary judgment. If that is enough to defeat class certification—and even make it an abuse of discretion to grant class certification—then certification would be almost impossible in any case. That is a far cry from this Court's and the Supreme Court's holding that predominance is "a test readily met in certain cases alleging … violations of the antitrust laws." *Cordes*, 502 F.3d at 108 (quoting *Amchem*, 521 U.S. at 625).

## CONCLUSION

This Court should affirm the district court's order granting class certification.

---

1282293, at *17 (S.D.N.Y. Mar. 28, 2014) (explaining that *Hanover Shoe* "rejected the monopolist's argument that it was entitled to show that the plaintiff had passed on the overcharge to its customers and had suffered no actual loss"); JA178-80, 2218-19, 2273-74.

Dated:  August 19, 2024

Respectfully submitted,


David H. Wollmuth                        */s/ Daniel L. Brockett*
William A. Maher                         Daniel L. Brockett
Ronald J. Aranoff                        Steig D. Olson
Randall Rainer                           David M. Cooper
WOLLMUTH MAHER &                         QUINN EMANUEL URQUHART
  DEUTSCH LLP                              & SULLIVAN, LLP
500 Fifth Avenue                         51 Madison Avenue, 22nd Floor
New York, NY 10010                       New York, NY 10010
Phone:  212-382-3300                     Phone:  212-849-7000
dwollmuth@wmd-law.com                    danbrockett@quinnemanuel.com

                                         Seth Ard
                                         Tamar Lusztig
                                         SUSMAN GODFREY LLP
                                         1301 Avenue of the Americas, 32nd Floor
                                         New York, NY 10019
                                         Phone:  212-316-8330
                                         sard@susmangodfrey.com


*Co-Lead Counsel for Plaintiffs-Appellees and the Class*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this brief is in compliance with the type form and volume requirements. Specifically, this brief is proportionately spaced; uses Times New Roman 14-point font; and contains 13,148 words, exclusive of the material not counted under Rule 32(f) of the Federal Rule of Appellate Procedure.

Dated: August 19, 2024

*/s/ Daniel L. Brockett*
Daniel L. Brockett
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: 212-849-7000
Fax: 212-849-7100
danbrockett@quinnemanuel.com

57

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August 2024, I caused a true and correct copy of the foregoing document to be filed electronically using the CM/ECF System, which will then send a notification of such filing to all counsel of record in this proceeding.

/s/  Daniel L. Brockett
Daniel L. Brockett
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
Phone:  212-849-7000
Fax:    212-849-7100
danbrockett@quinnemanuel.com